All righty, our next case is Bayless v. Coloplast Corporation, and we will hear first from Mr. Leppard. May it please the Court, Val Leppard for Coloplast. Near the start of Dr. Rosenzweig's testimony, District Court instructed the jury as follows. Ladies and gentlemen, Dr. Rosenzweig is here as it relates to Coloplast to offer specific opinions with respect to the device implanted in Ms. Bayless. So to the extent that he testifies, to any extent beyond that, to the product at large, you should disregard that. And his testimony is limited to the specific causation of the Coloplast product in Ms. Bayless. Now, that instruction was consistent with the trial of the District Court's pretrial ruling that Dr. Rosenzweig could not testify about general causation or design defect testimony as to Coloplast's rest of the wide product. So everything that plaintiff relies on from Dr. Rosenzweig in this case to support the verdict is necessarily limited to pertain only to competitive product, the Boston Scientific Advantage Fit, or to the question of specific causation as to Ms. Bayless. It cannot help the plaintiff meet her burden of proof on general causation as it pertains to Coloplast's product. But if we look at the jury instructions, I mean, let's just, if we look at the jury instructions and the law under Florida law, I mean, we do have to talk about general and specific causation at the Daubert stage. But where do you see that in the jury instructions or in the case law as it pertains to once you get past the pretrial stuff, once it's a jury issue? Okay, a couple of answers there. One, in terms of the jury instructions, they don't say that in Florida. They don't say that in other jurisdictions. We try these cases around the United States. I've not seen any jury instruction that says general causation versus specific causation. That's a pretty nuanced process that most drafters of jury instructions don't seem necessary to instruct a jury on. Just like the jury isn't told that you must have an expert who will testify about medical causation. The jury is not told that either. But it is nonetheless a requirement for a competent case. And we have cited, to your honor, several cases from this court where summary judgment was granted. In other words, there was no triable fact. There was nothing to be tried. There was no jury to be impaneled because the plaintiff lacked competent expert testimony. Let me ask it to you this way. Sure. It seems to me, even if we assumed, I'm not sure that I agree with you, but even if we assumed that there had to be specific and general causation evidence at the time of the verdict that was entered during the trial, that we have it on this record. Why don't we have it on this record? We have the one doctor who talks about how the mesh oxidizes in the body and that it turns gray when it oxidizes in the body, right? And that the body rejects it, and you can tell that the body has rejected it and it's oxidized. And what happens when the body rejects it? The product that your company makes is made of that mesh. And he says, you know, it happens every time. So, why isn't that? And in this specific case, we have the testimony about how the mesh is sticking down into Ms. Bayless' vagina and how there are other issues with the mesh, your client's product, et cetera. Why isn't that enough, even if we have to look at general and specific causation? Okay. I think the first expert Your Honor referenced was Dr. Mase. He was a polymer scientist. And he was precluded from testifying as to whether or not the degradation, the oxidization that you just talked about, causes any medical problems. And so you have the exact ruling is he may not testify that mesh degradation could cause pain or bleeding. The injury alleged in this case was an erosion of the mesh through the vagina wall causing pelvic pain. Dr. Mase was legally barred from testifying to that because he's not a medical expert. He could only take the football and take it to, let's call it the 20-yard line, right? But why couldn't Dr. Rosenzweig run it in? Because in this case, he was precisely limited according to the limiting instruction that I just read to you. Dr. Rosenzweig. Correct. I read the limiting instruction that was given at the start. So he's waiting at the 20, and the court is telling the jury he can't take it to the end zone. He's legally barred from taking it to the end zone. There's not going to be a handoff here because to any extent beyond that to the product at large, you should disregard that. And his testimony is limited to specific causation of the coloplast product in Ms. Bayless. And I want to be sure on Dr. Mase. But he says, he testifies, the product is gray in the body, and he testifies about all of the mesh that he's ever looked at because this is what he does, right? And this is how the body responds to mesh. He's not testifying about the product. He's testifying about mesh. And mesh is what your product happens to be made of. Why isn't that enough? That was specific causation. He said in this case he saw a discolorization, or that the record speaks of a discolorization, and that he believes that in this case Ms. Bayless suffered from a mesh erosion. That assumes general causation but is no substitute for it. As this court put it in McLean, as this court put it in Kilpatrick, as this court put it in Hendricks, specific causation testimony is not a substitute. And to your original question, all of those cases would be wrong. If we could just say, okay, at summary judgment we're going to look at whether there's general causation testimony, but once you get past summary judgment we're just going to disregard the existence of general causation testimony. We're going to allow a specific causation expert to leapfrog that analysis and prevail simply by giving specific causation testimony. And this is critically important. Weren't those cases really about Daubert? Yes. But isn't that a difference? I mean it seems to me that at the Daubert stage what you're looking for is an expert who can, who has to have more than it happened in this case and therefore that's the cause. And you have to have somebody who is able to testify at Daubert to get that ultimate opinion in. You have to have somebody who's able to testify it could happen, general causation, and it did happen, specific causation. And once you have that Daubert approved expert who can give that testimony, specific causation testimony, that's what goes to the jury. The jury doesn't need to know it could happen because they know it did happen. And this expert comes in to say it did happen here. And the only reason he's allowed to come in and say it did happen is because he has a foundation through the general causation. But he doesn't need to tell that to the jury. Everything you said was right. I like hearing that part. I don't like what's coming next. Everything you said was right except you ignored one critical piece. Dr. Rollins-White did not survive the Daubert analysis. Well, then he shouldn't have been allowed to testify at all. That was our point at summary judgment. We said, just like the defendant said in Kilpatrick, just like the defendant said in Hendricks, we said this case is over now because you're missing a general causation opinion to back up that assumption that underlies the specific causation. But you don't challenge the Daubert ruling. I mean, you don't. All you challenge is the verdict, right? We won. We won the Daubert ruling. I can't challenge something that I won. You can challenge on the basis. You don't challenge afterwards, for example, that the court allowed Dr. Rosenzweig to testify when, in your view, there was no general causation. Because he gave a limiting instruction, just like we asked him to. The first time that issue came to a head was near the beginning, and we launched an objection. We said, well, this is going into general causation, and he instructed the jury, you can't put it any better than he did in that instruction that I just read to you. So everything that Judge Rutherford articulated is correct. It's just that we won the Daubert ruling on general causation, and we should have been just like the defendant in Hendricks killed Patrick. Any of those cases, that should have been the end of the case right then and there, but we went forth with it. And I guess that's my problem. I mean, it seems like if the trial court or district court had granted summary judgment that said that there is no, your expert opinion that it happened in this case and therefore it's an issue cannot come in because it may be a one-off situation. We don't have any Daubert-approved ability to screen that possibility out. The case should have been decided at summary judgment, but it wasn't. And so that ship has sailed, has it not? But once it gets to the jury, the jury doesn't hear general causation testimony and specific causation. They are only asked to determine cause. So according to the holdings of this case in this court and kill Patrick in Hendricks, you need competent evidence on general causation and specific causation, and I assume that means before the jury. Otherwise, those cases and the posture of those appeals is summary judgment. So that looks at what a jury should or should not hear. But those were cases where the expert was excluded, right? Correct. And he was excluded on general causation. I won. I won on general causation. We should have never gone to a trial for that issue. And here's the real legal issue. The trial judge, the district court judge, believed that general causation is not necessary in a product liability case, only in toxic tort cases. That's the legal issue here. This court rejected it in a footnote in kill Patrick and said in footnote, I think it's footnote five, it said we reject that distinction because in that case kill Patrick, I think, was a pain pump, a medical device. Hendricks was a car seat, a child restraint system, also a product liability case. And the district court at summary judgment told us here that that requirement that I'm preaching about here today lies fully in toxic tort cases. But I'm into my rebuttal time. Unless there's questions for me now, I want to reserve some time for rebuttal. All right. Thank you, Mr. Leppert. Thank you. You've reserved five minutes. We'll hear from, is it Mr. Petavis? Petavis. Petavis. Thank you. Petavis. Good morning. May it please the court. My name is Dimitri Petavis, and I represent Ms. Raeann Bayliss. We're asking this court to affirm the final judgment because the jury's verdict is supported by sufficient evidence. Before I get into the evidence, first I'd like to discuss the nature of this court's review. Although Coloplast places much emphasis on the district court's pretrial rulings, those rulings are not the focus of this court's analysis. Instead, because Coloplast has only appealed the denial of its Rule 50 motion, the question is whether the verdict is supported by evidence. Specifically, whether considering all the evidence at trial and doing so in the light most favorable to Ms. Bayliss, whether there's evidence to support the verdict. And there is. I'll start with the evidence of causation. The standard for causation in this case is set forth in the district court's jury instructions. And I don't think the appellant disputes that there is sufficient specific causation testimony here. I think their point is that there is no general causation testimony in this trial record. Do you agree with that point? You just don't think it's necessary to have? Or do you disagree that there is general causation testimony here? The latter, Your Honor. Your Honor, we disagree. There is general causation testimony in the record. For example, at document 266, page 167, Dr. Rosenzweig opined, Coloplast Restyl Y-Mesh is causing or substantially contributing to Ms. Bayliss' injuries. He also discussed this at a more granular level. He described exactly how the mesh causes these injuries. The body responds to it, sends macrophage to the mesh. It encapsulates it in fiber. Nerves get trapped in the mesh. They get strangled. And that's how the patient has pain. Is that testimony consistent with the trial court's pretrial rulings and the instruction? Or did something come in that shouldn't have come in based on the pretrial ruling and the instruction yet wasn't objected to? I think probably the latter, Your Honor. And I think the district court recognized this. There's quotes from the district court where it recognized that this evidence had come in. And also there was a lot of overlapping evidence here because both products were made of the same material. So testimony about general causation for one product necessarily applied to the other. They're both made of polypropylene. And the experts said, you know, there's no difference in these products. The laws of physics and biology don't change whether it's one brand or the other. And also Dr. Rosenzweig wasn't the only expert to talk about general causation. Dr. May similarly testified about the foreign body response. He explained that it causes the mesh to stiffen and become hard, even though it's meant to be flexible and move with the body. And he said when that happens, this stiffening causes a mechanical mismatch between the mesh and the surrounding tissue such that, quote, it is going to cause pain when the patient moves. Also Dr. Jones, the implanting surgeon in this case, she recognized these complications. In fact, she's given presentations to doctors about these complications. One of them was called reducing the mesh mess. She also told our client, Ms. Bayless, there's a 5% to 10% chance that this mesh, quote, can cause delayed healing and eventually erode into the vagina. Finally, even one of the defense experts, Dr. Goldberg, he also recognized these complications. At document 284, page 84 to 85, he said, quote, a mesh exposure in and of itself is a known complication of any mesh repair. He also agreed there's a risk that mesh can, quote, erode through the tissue into the vagina and cause pain because of that. And even Coloplast's own instructions for use, these are the instructions that come with the Restorel Y, it acknowledged that the injuries we're claiming in this case are adverse effects associated with the use of the Restorel Y. So all of this was evidence of causation. And again, the question isn't who presented more evidence than the other or whether one side had the most compelling evidence. It's just was there sufficient evidence to support the jury's verdict? And there was. Unless this court has one question— What do you make of the opinions that counsel cited to us, Kilpatrick, and the others that were actually summary judgment cases, but at least in my mind, they were really Dahlberg cases. How do you respond to those cases? So, Your Honor, I think I heard one of your answers. You mentioned the experts were excluded. And that's right. The experts were totally excluded in these cases. So it wasn't like here where the evidence still came in. There was no evidence of causation. And I'll even quote from Kilpatrick in footnote one of this court's opinion. Kilpatrick conceded that absent the testimony of his expert, summary judgment was proper. That's not the case here. We're not conceding that issue. And it's the same in those other cases. All the evidence of causation was excluded. So there was nothing for the jury. Unless this court has more questions about causation, I'd like to turn to the evidence of design defect. The standard here is whether the risks of the product outweigh its benefits. And in its briefs, Coloplast seems to assume that an expert had to explicitly say that, that the risks outweigh the benefits. But that's not true. This court held in ignaeum that the ultimate question of whether the risks outweigh the benefits is a question for the jury to decide. And in fact, this court found the evidence sufficient in that case. And it didn't cite any testimony explicitly saying the risks outweigh the benefits. Instead, it said that, quote, taken in concert, the evidence in that case was sufficient. And very similar evidence was admitted in this case. We've provided a chart beginning on page 59 of our principal brief that shows that materially equivalent evidence was presented here. And then, of course, Dr. Jones testified that the risks don't outweigh the benefits, but the jury was entitled to disregard that testimony. Again, as this court explained in ignaeum, this contrary testimony is irrelevant to whether there was sufficient evidence. In any event, Dr. Rosenzweig testified about these risks, and he said he stopped using polypropylene mesh to treat pelvic organ prolapse because, quote, the risks were not worth it. There's also other evidence about defects. For example, Dr. Rosenzweig was testifying about a study that showed the erosion rate of mesh to be 10.3% and the dyspareunia rate to be 9.8%. And he said these rates were not acceptable because they were very high. So although Dr. Jones might have thought a 10% rate was okay, Dr. Rosenzweig said it wasn't, and it was up to the jury to balance that competing testimony. And even Dr. Jones' testimony that there's a 5% to 10% risk of erosion. Let me jump back to the other issue in the case. The pre-trial ruling on the Daubert motion was that Dr. And I know you've cross-appealed that issue, and I don't know if you wanted to argue anything on that, but the pre-trial ruling was that Dr. Rosenzweig could not give general causation testimony. Did that then preclude him from giving specific causation testimony, or should that have precluded him from giving specific causation testimony because he doesn't have a foundation to say it could happen, he only was able to say in this case it did happen? No, Your Honor. And in fact, if you look at the district court's order, it addressed that very issue. Coloplast, Mr. Leppert was claiming he won the Daubert ruling. Well, he didn't. Coloplast made that very argument below. It said Dr. Rosenzweig's specific causation testimony shouldn't come in because there's no general causation evidence. And the court rejected that argument. It said there's tons of general causation evidence. There's Dr. Jones' testimony, Dr. Mays' testimony, Dr. Rosenzweig's experience, the instructions for use. This isn't some case where— So that goes to your point that the cases the defendant's relying upon here are distinguishable because in that case, other than the excluded general causation expert, there was no other general causation. Right, exactly. The judges in those cases did what you were talking about. They said, hey, there's no general causation evidence, so this specific causation evidence isn't coming in. And it seems like that's the argument Coloplast is trying to make here, but they haven't appealed the district court's Daubert ruling. So the focus should be on the evidence admitted at trial and whether that was sufficient to support the verdict. And it was. Unless this court has any other questions, I'll cede the remainder of my time. Thank you, Mr. Petivus, and I'm sorry for getting your name wrong. I know you've appeared before me before. I will try to remember it for the next time. It's a difficult name. All right, Mr. Lepper. Thank you, Honor. So my colleague started out with Dr. Rosenzweig but omitted the limiting instruction where we started. The testimony that he's referencing that Dr. Rosenzweig gave by operation of that limiting instruction went to specific causation or to the other product at issue here where Dr. Rosenzweig was not limited and was allowed to go full bore and talk about risk balancing, risk utility balancing, general causation, all of those things. Let me ask you about the design defect claim. How is that, and I'll butcher the name of it, the ignamin case, how is that not dispositive of your claim on that? So I call it FNAM, but I've heard a different pronunciation. So at 1230 in the opinion, in FNAM, excuse me, 1320 of the opinion, it will say that Dr. Mays in that case testified that the product and this mechanical mismatch causes a sawing effect which, quote, ultimately caused some of the problems with the mesh. And then you had the testimony of two urogynecologists who talked about the mesh causing mesh-specific problems like pelvic pain, erosions, and other issues including the difficulty of removal. In other words, you did not have the evidentiary limitations that you had in this case. One, Dr. Mays here could not give that last part, the impact on the patient, and Dr. Rosenzweig, the only urogynecologist to testify for the plaintiff here, could not give the design defect general causation opinion. So that's the distinguishing factor. You had those two witnesses in full effect in FNAM. So, and on that note, I want to be sure that we don't forget about Dr. Mays for a moment. Mechanical mismatch. He opened his mouth on mechanical mismatch and was going to say it causes problems. I said, page 68 of the transcript, objection sustained. He comes back later on and says this results in a stiffening of the abdominal wall. Objection sustained. And at the end of the direct examination, they ask him whether this causes an unreasonable risk to patients. Objection sustained. And the district court, this is on page 47 of that transcript, is really worth noting, says, look, he can talk about the material being defective in the sense that it's not suitable for implementation in the human body. But you can't go any further than that and talk about the impact that that may have on the human body. You are not allowed to talk about risks. So that was sustained. And what my colleague is talking about here is, and this is really worth noting, all the citations for Dr. Mays are the cross-examination by our co-defendant, Boston Scientific, where they're merely trying to establish with Dr. Mays, you're not a medical expert, which he ultimately concedes. But in the process, he pipes off about, well, the literature says it causes pain. It causes pain. Number one, the literature he cites did not support that. The jury did not hear that. But number two, it is conceded in the record at page 74. It's ECF 357. That's volume three, page 74, 75. He concedes, I'm not a medical expert. I can't determine that pain. I can't make that determination. So you have multiple sustained objections. When Dr. Mays tries to cross that line, the line that he was allowed to cross in FEM, and then you have him conceding on that cross-examination that he's not a medical expert. So where are we now under Rule 50 motion? There has to be competent testimony. And it can't be that the standard is, at summary judgment, you have to have both competent expert testimony on specific causation and general causation. But then we get to a Rule 50 motion, and that standard has disappeared. That can't be it. That can't be a lot. It can't be a distinction there between a Rule 56 motion on that topic and a Rule 50 motion on that topic. It was the exact same thing. And in Hendricks, yes, there were challenges to both specific causation and general causation. But if I remember the opinion correctly, the court stopped its analysis after concluding that there was general causation testimony missing and affirmed the grant of summary judgment for lack of general causation testimony. That is what should have happened here. The crux of the issue here, Your Honors, is the district court saying that general causation is not required in this kind of a case. Under that logic, we went on to have a jury trial. Let me ask you maybe a practical question or an irrelevant question, depending on how you perceive it. How many more of these MeSH cases are out there? Many, many. How many is many, many? Dozens? Hundreds? It's definitely in the hundreds, yes. I mean, if you look nationwide, we're talking thousands. I think it's many, many in the state of Florida alone, right? So this is a recurring issue for sure. Okay. Thank you. I see I've run out of my time. Thank you, Counsel. Appreciate it. Well argued on both sides. We appreciate your arguments. We'll take it under advisement. We'll be in adjournment until tomorrow. Thank you.